No. 21-50642

## In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

VICTOR MANUEL CAMPOS-AYALA;
MARTIN MONCADA-DE LA CRUZ,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Texas

## BRIEF OF DEFENDANT-APPELLANT CAMPOS-AYALA

SHANE O'NEAL
O'NEAL LAW
101 E. Avenue B
Alpine, Texas 79830
(713) 51603595
shane@shaneoneallaw.com

*Attorney for Defendant-Appellant*

# CERTIFICATE OF INTERESTED PERSONS

## UNITED STATES v. VICTOR CAMPOS AND MARTIN MONCADA, No. 21-50642

The persons having an interest in the outcome of this case are:

1. **Victor Campos-Ayala,** Defendant-Appellant;

2. **Martin Moncada-De La Cruz**, Defendant-Appellant;

3. **Ashley C. Hoff,** U.S. Attorney;

4. **Eduardo Mendoza** and **Andrew Weber,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Stephanie Lee Milliron,** who represented Defendant-Appellant Campos in the district court;

6. **Sandra Stewart,** who represented Defendant-Appellant Moncada in the district court;

7. **Shane O'Neal,** who represents Defendant-Appellant in this Court; and

8. **Philip J. Lynch,** who represents Defendant-Appellant Moncada in this Court.

s/ Shane O'Neal
SHANE O'NEAL
*Attorney for Defendant-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Victor Campos requests oral argument. Campos join in co-defendant Moncada's argument that his conviction cannot stand because the evidence did not support the verdict. The government's case was entirely lacking in evidence that a reasonable juror could have found that Campos possessed marijuana with the intent to distribute it. Further, Campos argues that the evidence most relied on by the government—his statements made during his apprehension—must be suppressed because they were custodial and made without *Miranda* warnings. Finally, Campos also joins Moncada's argument that the indictment should have been dismissed before trial because the government deported a favorable, material witness without telling Campos's counsel. Oral argument may assist the Court's consideration and resolution of the issues.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ................................. i

STATEMENT REGARDING ORAL ARGUMENT ......................... ii

TABLE OF AUTHORITIES ............................................................iv

SUBJECT MATTER AND APPELLATE JURISDICTION..............1

ISSUES PRESENTED FOR REVIEW .............................................2

STATEMENT OF THE CASE.........................................................3

SUMMARY OF THE ARGUMENT ...............................................13

ARGUMENT AND AUTHORITIES .............................................15

    1. The district court erred in denying the motion to suppress statements. ....................................................................................15

    A.  Standard of review...............................................................15

    B.  Campos and Moncada were in custody when Agent Ramos questioned them. .....................................................16

CONCLUSION..............................................................................23

CERTIFICATE OF SERVICE.......................................................25

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ........................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Berkemer v. McCarty,*
    468 U.S. 420 (1984) ................................................................17, 18

*Burks v. United States,*
    437 U.S. 1 (1978) ......................................................................23

*J.D.B. v. North Carolina,*
    564 U.S. 261 (2011) ...................................................................17

*Rhode Island v. Innis,*
    446 U.S. 291 (1980) ...................................................................21

*United States v. Allen,*
    2005 WL 4882723 (S.D. Ind. Aug. 19, 2005) ..............................21

*United States v. Bengivenga,*
    845 F.2d 593 (5th Cir. 1988) ......................................................20

*United States v. Carter,*
    884 F.2d 368 (8th Cir. 1989) ......................................................21

*United States v. Cavazos,*
    668 F.3d 190 (5th Cir. 2012). ...............................................15, 19

*United States v. Chavira,*
    614 F.3d 127 (5th Cir. 2010) ......................................................18

*United States v. Harrell,*
    894 F.2d 120 (5th Cir. 1990) ......................................................16

*United States v. Nelson,*
    990 F.3d 947 (5th Cir. 2021) ...........................................16, 17, 23

*United States v. Ortega,*
    379 F.Supp.2d 1177 (D. Kan. 2005).............................................21

*United States v. Richardson,*
    700 F.Supp.2d 1040 (N.D. Ind. March 18, 2010) ........................21

*United States v. Shabazz,*
  993 F.2d 431 (5th Cir. 1993) .......................................................18

**Statutes**

18 U.S.C. § 3231..................................................................................1

18 U.S.C. § 3742(a) ...........................................................................1

28 U.S.C. § 1291..................................................................................1

**Rules**

Fed. R. App. P. 32(a)(5)....................................................................26

Fed. R. App. P. 32(a)(6)....................................................................26

Fed. R. App. P. 32(a)(7)(B)...............................................................26

Fed. R. App. P. 32(f).........................................................................26

Fed. R. App. P. 4(b)(1)(A)(i) ............................................................1

Federal Rule of Appellate Procedure 28(i) .....................................13

## SUBJECT MATTER AND APPELLATE JURISDICTION

**1.  Subject Matter Jurisdiction in the District Court.** This case arose from the prosecution of an alleged offense against the laws of the United States. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

**2.  Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the United States District Court for the Western District of Texas entering a judgment of criminal conviction and imposing sentence. This Court has jurisdiction of the appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

A criminal defendant who wishes to appeal a district court judgment must file a notice of appeal in the district court within 14 days after the judgment's entry. Fed. R. App. P. 4(b)(1)(A)(i). In this case, sentence was pronounced on June 29, 2021, Campos filed a notice of appeal on June 29, 2021, and written judgment was entered on July 15, 2021.

## ISSUES PRESENTED FOR REVIEW

1. Whether the indictment should have been dismissed because the government deported a witness with material testimony favorable to Campos in violation of his rights to due process of law and to compulsory process to obtain witnesses for his defense.

2. Whether, when the evidence showed only that Campos touched and was near marijuana transported by another man who had offered him a ride, the conviction must be reversed because no evidence showed that Campos possessed marijuana with intent to distribute it.

3. Whether, when Campos was held in the car by troopers and agents for over thirty minutes, surrounded by uniformed, armed officers, watched each of his fellow passengers be formally arrested, and asked accusatory questions that went to key elements of the offense, he was in custody to the degree that *Miranda* rights should have been read to him before he gave partially, inculpatory answers.

## STATEMENT OF THE CASE

Victor Campos-Ayala and Martin Moncada-De La Cruz crossed illegally from Ojinaga, Chihuahua, Mexico, into Presidio, Texas. ROA.1544. When they crossed, they were accompanied by a woman—Karina Castro-Hernandez—and her six-year-old daughter. ROA.1544. All four of them hoped to travel to Odessa, Texas. ROA.1080.

They spent the evening hiding under a bridge near the border. ROA. 1544. The next day, they flagged down a car driven by seventeen-year-old Jose Ramos. Ramos picked them up and drove them to Van Horn, Texas. ROA.1078-79; ROA.1544. Initially, there were not any drugs in the car. ROA.1544.

Ramos drove the group to Van Horn—a small town on Interstate 10. ROA.1544. In Van Horn, Ramos dropped the passengers at a roadside park and told them he would return in 35 to 40 minutes. ROA.1544.

When the driver returned, there were five large bundles of marijuana—weighing approximately 57 pounds each—in the car. ROA.1544; ROA.1077. Moncada helped move the bundles around so that he and the others could fit inside the car. ROA.1547. The car resumed its journey towards Odessa.

3

At some point, a concerned citizen called police, saying they had seen people loading large bundles in a silver or grey compact car. ROA.1320-21. Not long after, Texas Highway Patrol Troopers Terrance Foster and Vince Lujan saw a vehicle fitting the description, with bundles visible through the window. ROA.1320. The troopers stopped the car. ROA.1321.

As the troopers approached the car, they could see the large bundles. ROA.1321. They ordered the driver out of the car, handcuffed him, and sat him on the side of the road. ROA.1321-22. They ordered the passengers: "stay in there," "don't get out of this car," "stay here," "stay," "aqui." Gov't Ex. 3 (Foster's video, at 00:18-1:15); ROA.1282. "Aqui" is the Spanish word for "here." The two troopers were uniformed and visibly armed. *Id*; ROA.1279.

While the troopers waited for the arrival of Border Patrol agents, they held the driver in handcuffs next to the car and remained stationed near the doors, with the passengers inside. During the stop, the troopers specifically mentioned that they did not want to let the passengers out because they feared the passengers would run and a chase would ensue. Gov't Ex. 3 (Foster's video, at

4

14:40-15:00). Further, Trooper Foster photographed the passengers and the contents of the car while they waited. Gov't Ex. 3 (Foster's video, at 21:40-21:50).

Approximately twenty-six minutes into the stop,[1] U.S. Border Patrol agents arrived. Gov't Ex. 3 (Foster's video, at 25:55-26:30). At this point, six visibly armed members of law enforcement with four vehicles with lights flashing were on the scene. ROA.1263-64.

When the agents arrived, the troopers explained that they had four illegally-present aliens in the car and five bundles of marijuana. Gov't Ex. 3 (Foster's video, at 26:10-26:40). The troopers explained that they kept the passengers in the car to avoid a chase and had not asked anyone questions or read anyone their rights. Gov't Ex. 3 (Foster's video, at 27:10-27:30).

Thirty-one minutes into the stop, troopers and agents started to remove the bundles of marijuana as well as the woman—Castro—and her young child. Gov't Ex. 3 (Foster's video, at 31:20-

---

[1] Agents consistently testified that the passengers were detained in the car for at least an hour. The body camera footage, from Trooper Foster, shows that it took Border Patrol agents twenty-six minutes to arrive and that Moncada and Campos were removed from the car approximately thirty-five minutes into the traffic stop. *Compare* ROA.1319-26; ROA.1343; ROA.1372-80 *with* Gov't Ex 3 (Foster's body cam video).

34:22). Agents secured Castro and her child in a Border Patrol transport van after removing her from the car. *Id.*

Thirty-five minutes into the stop, agents began talking with Moncada and Campos while they are still in the car and removing them from the car. Gov't Ex. 3 (Foster's video, at 35:00-41:00). At some point, Agent Ramos told them to stay in the car and that he was going to frisk them. ROA.1269.

Moncada was "in a fetal position" behind the driver's seat, and Campos was behind the passenger seat with "half his torso and head" visible and "his legs on the other side" of a bundle. ROA.1258-59; *see* ROA.1661-62.

After Agent Ramos introduced himself, he asked them, "Do you know what you're on?" ROA.1258. Ramos elaborated, "The weed?" Campos answered, "Yes." ROA.1258. Moncada nodded affirmatively. ROA.1258.

After Moncada had been removed from the car, Agent Ramos removed Campos and frisked him. During the frisk, Ramos asked Campos why he helped with the drugs. ROA.1261. Campos responded that he did not. ROA.1261. Ramos asked, "No?" Campos responded, "No." Once Ramos finished the frisk, he walked Campos towards the transport van and ask, "Okay, so why did you

cross the drugs." Ramos responded, "I didn't. I just helped." Ramos responded, "Exactly."

The parties were transported for processing. After the apprehension, Drug Enforcement Administration agents interviewed Moncada, Campos, and Castro at the station where they all gave consistent stories—relating the facts above.

When interviewed and asked if he understood what he was being charged with, Campos stated, in Spanish slang, "Well, I guess that's how it goes. Yes, I was in possession of the marijuana." ROA.1547. The driver—Ramos—was not interviewed because he was a minor. ROA.910.

Moncada and Campos were charged with possessing more than 100 kilograms of marijuana with intent to distribute it. ROA.918. Neither Castro nor Ramos were charged. Ramos was removed from the United States. ROA.1293-00; ROA.1719-20. Castro was not charged because he was a minor. ROA.910.

The government did not disclose the contents of Castro's interview prior to—or even after—her deportation. ROA.909-10. Agent Kettani did not mention the interview during the preliminary

hearing. ROA.1076-89. Instead—knowing that Castro corroborated Campos's and Moncada's accounts—the government deported her. ROA.1293-97.

When defense attorneys discovered Castro's favorable testimony, they moved to dismiss the indictment. ROA.1718-27. They further moved to suppress the introduction of evidence that Campos and Moncada had confessed in statements not disclosed until three days prior to trial as untimely produced. ROA.1011-13. They also moved to suppress those statements as taken during custodial interrogation, without *Miranda* warnings. ROA.1007-09.

The Court denied the motion to bar the evidence because the government had not acted in bad faith. ROA.1031-32.

The Court held a hearing on the motion to suppress prior to trial. Agent Ramos—called by the government—testified to the events as related above. ROA.1255-62. Trooper Foster—called by the defense—also testified to the events as related above. Foster also added that the occupants of the car were not free to leave at any point during the stop. ROA.1282.

The district court denied the motion to suppress, finding: (a) waiting for the arrival of border patrol agents did not cause undue

delay, (b) that Agent Ramos's questioning was not formal but contemporaneous, and (c) that Campos was never handcuffed. ROA.1301. Taking those facts into consideration, the district court concluded that though Campos was not free to leave, there was not a formal arrest; he was not in custody for *Miranda* purposes. ROA.1302.

On the motion to dismiss for the deportation of a material witness, the defense called Azucena Carrasco of Texas Department of Family and Protective Services. ROA.1389. That agency assists law enforcement when a person is arrested with a child. ROA.1289-90. Despite being in operation at the time of the arrest, the agency was not contacted to assist with Castro's child. ROA.1291-92. The defense offered this witness to rebut the government's excuse for deporting Castro—that they could not hold her without separating her from her child.

The Court concluded that the government did not deport Castro in bad faith, referring to the COVID protocols. ROA.1302. The Court also indicated that it would hold the motion in abeyance to determine whether the government's representation that the testimony would be cumulative would be shown to be true at trial. ROA.1303.

Campos's and Moncada's statements played a lead and pivotal role in the government's case—from the opening statement on. ROA.1315.

At trial the government first called Trooper Foster who described the stop. ROA.1319-1345. Next, forensic chemist Clay Phelan testified that the substance was marijuana. ROA.1349-1368. Border Patrol Agent Daniel Walters testified that he was one of the three agents who responded to the trooper's call for assistance. ROA.1371-1396. Agent Ramos also testified about what happened when Border Patrol responded. ROA.1397-1422. Agent Ramos testified about the statements that Campos and Moncada had made to him while agents moved them from the car to the Border Patrol transport van. ROA.1401-07.

As the trial continued, Border Patrol Agent Chavez testified about his calibration of the scales and the weight of the marijuana—128.54 kilograms. ROA.1468-93. Drug Enforcement Administration Task Force Officer Bustamante testified about the chain of custody and weight of the marijuana, some of Campos's and Moncada's statements, and Bustamante's receipt of the cell phones yet failure to find incriminating evidence on them. ROA.1494-1527.

Finally, Task Force Officer Valerie Kettani testified. ROA.1531-68. Kettani's testimony was largely repetitive of Bustamante's.

The defense made a rule 29 motion. ROA.1568. The district court denied the motion. ROA.1569.

The defense called Janis Palma, an expert in the Spanish language. ROA.1577. Palma discussed the similarity in Spanish between the words "possession" and "position" as well as the high likelihood that people speaking different dialects would confuse the two words. ROA.1582-84.

The parties rested and closed. ROA.1607-1609.

In closing arguments, the government admitted—and even emphasized—that its case was limited to "these defendants were found literally on top of 128 kilograms of marijuana." ROA.1640. The government also emphasized that Campos told Agent Ramos, "I helped with it." ROA.1641. For intent to distribute, the government relied on the weight alone. ROA.1642-43. The government repeatedly emphasized, "They said, Yeah, I help load it." ROA.1643.

The jury found Campos guilty as charged. ROA.755. The district court imposed the statutorily mandated 60-month imprisonment term. ROA.165-171.

## SUMMARY OF THE ARGUMENT

**1. The district court erred by denying the motion to dismiss.**

Pursuant to Federal Rule of Appellate Procedure 28(i), Campos adopts by reference co-defendant Moncada's first issue arguing that the district court should have dismissed the indictment because the government deported a witness who had favorable testimony. For the same reasons that the testimony was favorable to Moncada, it was also favorable to Campos.

**2. The evidence was insufficient to support the conviction.**

Pursuant to Federal Rule of Appellate Procedure 28(i), Campos adopts by reference co-defendant Moncada's second issue arguing that the evidence was insufficient to show possession or intent to distribute. The evidence against Moncada and Campos was identical, except that the government emphasized Campos's statements that he had helped. This issue is strengthened by Campos's third issue that the denial of the motion to suppress was in error.

**3. The district court erred in denying Campos's motion to suppress his statements.**

The Fifth Amendment, as well as the Supreme Court's decision in *Miranda v. Arizona*, requires that officers not subject suspects

to custodial interrogation without first advising them of their relevant rights.

Agent Ramos encountered Campos and Moncada while they were being held in a vehicle that also contained five large bundles of marijuana. Campos and Moncada had been held in the car since it was seized by Texas State Troopers approximately thirty-five minutes earlier. Six uniformed and armed agents in four vehicles surrounded the car that Campos and Moncada were in. Each person was removed and placed in a police car—Campos and Moncada were last.

Once only Campos and Moncada remained in the vehicle, Agent Ramos asked them if they were aware of what they were sitting on. They admitted they knew it was marijuana. After agents transferred Moncada to a transport van, Ramos repeatedly asked Campos about his relationship to the marijuana until he admitted that he had helped with it in some way.

Campos and Moncada moved to suppress their statements. The district court found they were not custodial. The district court erred.

# ARGUMENT AND AUTHORITIES

## 1. The district court erred in denying the motion to suppress statements.

Officers are required to read a suspect his *Miranda* rights prior to custodial interrogation. A person is in custody when, given the circumstances of the interrogation, a reasonable person would not feel free to terminate the interview and leave.

Campos and Moncada accepted transportation from a seventeen-year-old boy who had also decided to transport marijuana. Troopers stopped the car, removed the driver, and detained Campos and Moncada inside until Border Patrol arrived to formally arrest them. They were in custody; their statements prior to being advised of their rights should have been suppressed.

### A. Standard of review.

"In an appeal from a district court's ruling on a motion to suppress, this Court reviews factual findings in support of the ruling under the clearly erroneous standard and legal conclusions *de novo*. The evidence is viewed in the light most favorable to the party who prevailed in the district court." *United States v. Cavazos*, 668 F.3d 190, 193 (5th Cir. 2012).

"The question of whether *Miranda*'s guarantees have been impermissibly denied to a criminal defendant, assuming the facts as

15

established by the trial court are not clearly erroneous, is a matter of constitutional law meriting *de novo* review." *United States v. Harrell*, 894 F.2d 120, 122-23 (5th Cir. 1990).

## B. Campos and Moncada were in custody when Agent Ramos questioned them.

"[A] suspect's incriminating statements during custodial interrogation are inadmissible if he has not first received *Miranda* warnings" *United States v. Nelson*, 990 F.3d 947, 955 (5th Cir. 2021). There was no testimony and the government never argued that Campos and Moncada received *Miranda* warnings before Agent Ramos's questioning. The determinative issue is whether they were in custody.

"A suspect is 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *Id.* (internal quotations omitted). "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was

at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (internal quotations omitted).

To determine whether questioning was custodial, this Court considers some non-exhaustive, key details: "(1) the length of the questioning; (2) the location of the questioning; (3) the accusatory, or non-accusatory, nature of the questioning; (4) the amount of restraint on the individual's physical movement; and (5) statements made by officers regarding the individual's freedom to more or leave." *Nelson,* 990 F.3d at 955.

This interrogation occurred during the seizure of a vehicle based on a reasonable suspicion that it was involved in drug smuggling. Not all vehicle stops implicate *Miranda*'s concerns. *Berkemer v. McCarty*, 468 U.S. 420, 437-39 (1984). Traffic stops generally last only a few minutes, occur in view of the public, and involve at most two policemen. *Id*. Because these factors reduce the coercive concerns that justified the *Miranda* warnings, "persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of *Miranda*." *Id*. at 440. If a traffic stop ripens into detention that renders the motorist "'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*. *Id*.

The troopers' stop of the car ripened into detention that rendered Campos and Moncada in custody. The troopers stopped them because the car matched the description of a suspicious car. ROA.1320-21.

The stop began as a *Terry*-like stop that *Berkemer* held was noncustodial. *Id*. As the troopers approached the car, they noticed packages of marijuana, removed the driver, handcuffed the driver, and ordered the passengers to stay inside the car. Gov't Ex. 3 (Foster's video, at 00:18-1:15). After that point, the stop was no longer a brief, investigatory detention; it was a full custodial arrest. Trooper Foster testified: they were not free to leave. ROA.1282.

When the driver was removed and the passengers ordered to stay in the car, "the case changed from" an investigatory stop "to an essentially criminal law enforcement case." *United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010).

As time passed, the custodial nature of the detention became more apparent. Trooper Foster held all four passengers in the car for twenty-six minutes to await the arrival of Border Patrol agents. "A prolonged investigative detention may be tantamount to a *de facto* arrest . . . ." *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993). Here, the detention was not investigative. It was merely

to await backup agents from the agency that was interested in processing the arrest.

Further, Trooper Foster's use of the car as a makeshift holding cell—to protect against escape until a formal arrest could be made—was readily apparent and declared by Foster. Gov't Ex. 3 (Foster's video, at 14:40-15:00). Foster's photographing of the scene was also consistent with documenting evidence for future prosecution—another sign of an arrest in process. Gov't Ex. 3 (Foster's video, at 21:40-21:50). These acts would have made any reasonable person, held in the car by law enforcement, realize that he was under arrest.

Once Border Patrol agents arrived, the custodial nature of the seizure became clearer still. Before the passengers were removed from the car, six, uniformed and armed officials surrounded it. Gov't Ex. 3 (Foster's video, at 28:55-29:20); ROA.1263-64. The officers had arrived in four law-enforcement vehicles, with lights flashing. Gov't Ex. 3 (Foster's video, at 28:55-29:20); ROA.1263-64. While Agent Ramos was ultimately the only officer to interrogate Campos and Moncada, "the presence of other officers at the location is also relevant to the Court's inquiry." *Cavazos*, 668 F.3d at 194 n.3.

Agents' actions before removing Campos and Moncada from the car showed their intention to arrest them. Agents moved a secure Border Patrol transport van in front of the car. Gov't Ex. 3 (Foster's video, at 31:30-31:45). While Campos and Moncada watched, agents removed Castro and her daughter—who had crossed illegally with them—and escorted them into the transport van. (Foster's video, at 34:13-34:58).

Campos and Moncada knew they were here illegally as well and would be treated similarly. "The *awareness* of the person being questioned by an officer that he has become the 'focal point' of the investigation, or that the police have ample cause to arrest him, may well lead him *to conclude*, as a *reasonable person*, that he is not free to leave, and that *he has* been significantly deprived of his freedom . . . ." *United States v. Bengivenga*, 845 F.2d 593, 597 n.16 (5th Cir. 1988) (emphasis in the original).

Finally, Agent Ramos's questioning communicated to Campos and Moncada that they were the focus of an investigation and not free to leave. "[T]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, . . . any words or actions on the part of the police . . . that the police should know are reasonably

likely to elicit an incriminating response . . . ." *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980).

Agent Ramos first asked, "Do you know what you are sitting on?" ROA.1258. When Campos and Moncada didn't respond, he specified, "The weed?" ROA.1258. This was an accusatory question designed to illicit an incriminating response as knowledge is an element of possession with intent to distribute.

In *United States v. Richardson*, an officer removed a bag of drugs from a motorist's pocket and asked, "What is this?" 700 F.Supp.2d 1040, 1052-32 (N.D. Ind. March 18, 2010). The district court found that the question would illicit an incriminating response and no reasonable person would have felt free to leave when the officer was confronting him with drugs pulled from his pocket. *Id*; *see also United States v. Carter*, 884 F.2d 368, 372 (8th Cir. 1989) (finding fact that defendant was "confronted with damning evidence of guilty" relevant to custody determination.); *United States v. Ortega*, 379 F.Supp.2d 1177, 1186 (D. Kan. 2005) (concluding defendant was in custody during traffic stop after he was told a dog had alerted to scent in his car); *United States v. Allen*, 2005 WL 4882723 (S.D. Ind. Aug. 19, 2005) (finding defendant wouldn't feel

free to leave after being told he had been suspected of carrying drugs and canine unit had been called to location of car stop).

After Moncada was removed from the car, Agent Ramos continued to ask Campos accusatory questions. Moncada's removal, frisk, and escort to the transport van further communicated to Campos that this was custodial detention. Further, Agent Ramos frisked Campos and voiced a critical accusation, asking why he helped with the drugs. ROA.1261. Campos responded that he did not. ROA.1261. As he walked Campos to the transport van, Ramos asked again, "Okay, so why did you cross the drugs?" Ramos responded, "I didn't. I just helped."

In sum, Agent Ramos's questions about Campos's knowledge of and relationship to the marijuana were custodial. (1) Campos was detained for more than thirty minutes before the questioning. (2) The questioning occurred inside the car where Campos had been held for more than half an hour and continued while he was being escorted to the transport van. (3) All of the questions were accusatory and went directly to key elements of the crime Campos was ultimately charged with. (4) Campos was told from the beginning of

the stop that he could not leave the car, finally he was escorted directly to the Border Patrol transport van. (5) Campos was never told he was free to leave. *See Nelson*, 990 F.3d at 955.

The district court's error in denying the motion to suppress was not harmless. The evidence to convict Campos was insufficient, even with the statements. The government relied on Campos's admissions in its opening and closing statement as definitive proof that he intended to possess and help with the marijuana. ROA.1316; ROA.1641.

The convictions should be vacated. The case should be remanded to the district court with instructions to grant the motion to suppress the statements made to Agent Ramos and hold a new trial.

## CONCLUSION

For these reasons, Campos's conviction should be vacated, and the case dismissed with prejudice. Alternatively, the conviction should be reversed, and the case dismissed with prejudice. *Burks v. United States*, 437 U.S. 1, 18 (1978).


Respectfully submitted.

s/ Shane O'Neal
SHANE O'NEAL
O'NEAL LAW
101 E. Avenue B
Alpine, Texas 79830
(713) 516-3505
shane@shaneoneallaw.com

*Attorney for Defendant-Appellant*

## CERTIFICATE OF SERVICE

I hereby certify that on December 10th, 2021, I electronically filed the Brief of Defendant-Appellant with the Clerk of Court using the CM/ECF system which will send notification of the filing to Ashley Hoff, U.S. Attorney for the Western District of Texas (Attn: Assistant U.S. Attorney Joe Gay), by electronic mail.

s/ Shane O'Neal
SHANE O'NEAL
*Attorney for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,905 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Shane O'Neal
SHANE O'NEAL
*Attorney for Defendant-Appellant*
Dated: December 10, 2021