No. 21-50642

IN THE

# United States Court of Appeals

FOR THE FIFTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

V.

VICTOR MANUEL CAMPOS-AYALA;
MARTIN MONCADA-DE LA CRUZ,
DEFENDANTS - APPELLANTS

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

---

## SUPPLEMENTAL EN BANC BRIEF OF DEFENDANT-APPELLANT MONCADA

---

Philip J. Lynch
Law Offices of Phil Lynch
17503 La Cantera Parkway
Suite 104-623
San Antonio, Texas 78257
(210) 378-3114

*Attorney for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

*United States v. Victor Campos and Martin Moncada*

No. 21-50642

The persons having an interest in the outcome of this case are:

1. **Martin Moncada de la Cruz,** Defendant-Appellant;

2. **Victor Campos Ayala,** Defendant-Appellant;

3. **Jaime Esparza,** U.S. Attorney;

4. **Eduardo Mendoza and Andrew Webber,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Richard L. Durbin Jr., Assistant U.S. Attorney,** who represented Plaintiff-Appellant in the district court**;**

6. **Stephanie Lee Milliron,** Attorney at Law, who represented Defendant-Appellant Campos in the district court;

7. **Sandra Stewart,** Attorney at Law, who represented Defendant-Appellant Moncada in the district court;

8. **Shane O'Neal,** Attorney at Law, who represents Defendant-Appellant Campos in this Court; and

9. **Philip J. Lynch,** Attorney at Law, who represents Defendant-Appellant Moncada in this Court.

i

By: _____/s/ Philip J. Lynch_____
Attorney for Defendant-Appellant
Moncada

## STATEMENT REGARDING ORAL ARGUMENT

The panel correctly determined that Moncada's conviction was not supported by sufficient evidence. Oral argument may assist the Court in considering Moncada's challenge to the sufficiency of the evidence and to the district court's denial of Moncada's motion to dismiss.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................... i

REQUEST FOR ORAL ARGUMENT ....................................................... ii

TABLE OF CONTENTS .............................................................. iii

TABLE OF AUTHORITIES .................................................... iv

SUBJECT MATTER AND APPELLATE JURISDICTION ...................... 1

ISSUES PRESENTED.................................................................. 2

STATEMENT OF THE CASE ................................................. 3

SUMMARY OF THE ARGUMENTS ....................................... 15

ARGUMENTS AND AUTHORITIES

      I. The Evidence Was Insufficient to Support the Conviction ..............17

      II. Because the Government Deported a Witness Who Had Material Testimony Favorable to Moncada, the District Court Erred by Denying the Motion to Dismiss ........................................................45

CONCLUSION ......................................................................56

CERTIFICATE OF SERVICE.................................................. 58

ECF CERTIFICATION .......................................................... 58

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Burks v. United States,*
  437 U.S. 1 (1978) ................................................................. 57

*California. v. Trombetta,*
  467 U.S. 479 (1984) ............................................................ 47

*Giglio v. United States,*
  405 U.S. 150 (1972) ............................................................ 49

*Lisenba v. California,*
  314 U.S. 219 (1941) ............................................................ 47

*Jackson v. Virginia,*
  443 U.S. 307 (1979) ......................... 19, 36, 37, 38, 39, 40, 41, 44

*Miranda v. Arizona,*
  384 U.S. 436 (1966) ......................................................... 6, 10

*United States v. Agurs,*
  427 U.S. 97 (1976) .......................................................... 49, 55

*United States v. Allie,*
  978 F.2d 1401 (5th Cir. 1992) ............................................ 51

*United States v. Brito,*
  136 F.3d 397 (5th Cir. 1998) .......................................... 23. 33

*United States v. Cabellero,*
  712 F.2d 129 (5th Cir. 1983) ............................................. 25

*United States v. Cabello,*
  33 F.4th 281 (5th Cir. 1983) ........................................ 19, 37, 40

*United States v. Canada*,
   459 F.2d 687 (5th Cir. 1972) ...................................................................... 35

*United States v. Chaparro-Alcantara*,
   226 F.3d 616 (7th Cir. 2000) ...................................................................... 48

*United States v. Cordova-Larios*,
   907 F.2d 40 (5th Cir. 1990) ........................................................... 20, 23, 52

*United States v. Crain*,
   33 F.3d 480 (5th Cir. 1994) ................................................................. 28, 34

*United States v. Delgado*,
   672 F.3d 320 (5th Cir. 2012) (en banc) ................................. 18, 40, 42, 44

*United States v. Ferg*,
   504 F.2d 914 (5th Cir. 1974) ....................................................... 20, 23, 52

*United States v. Gardea-Carrasco*,
   830 F.2d 41 (5th Cir. 1987) ................................................................. 28, 29

*United States v. Gordon*,
   700 F.2d 215 (5th Cir. 1983) ....................................................... 20, 23, 28

*United States v. Gonzalez*,
   436 F.3d 560 (5th Cir. 2006) ............................................................. 48, 51

*United States v. Guevara*,
   242 F.2d 745 (5th Cir. 1957) ...................................................................... 19

*United States v. Iribe-Perez*,
   129 F.2d 1167 (10th Cir. 1997) ................................................................. 48

*United States v. Ivy*,
   972 F.2d 1173 (5th Cir. 1992) .................................................................... 32

*United States v. Kitchen*,
   57 F.3d 516 (7th Cir. 1995)...............................................................22, 24

*United States v. Lane*,
   267 F.3d 715 (7th Cir. 2001) ................................................................ 21

*United States v. Lindell*,
   881 F.2d 1313 (5th Cir. 1989) .............................................................. 23

*United States v. Lopez-Monzon*,
   850 F.3d 202 (5th Cir. 2017) ................................................................ 23

*United States v. Martinez*,
   588 F.2d 495 (5th Cir. 1979).............................................................25, 26

*United States v. Moreno-Hinojosa*,
   804 F.2d 845 (5th Cir. 1986)................................................20, 23, 24, 27

*United States v. Meza*,
   701 F.3d 411 (5th Cir. 2012)......................................................20, 22, 23

*United States v. Moreland*,
   665 F.3d 137 (5th Cir. 2011)..........................................................20, 25

*United States v. Moreno-Hinojosa*,
   804 F.2d 845 (5th Cir. 1986)......................................... 20, 23, 24, 27, 38

*United States v. Munoz*,
   150 F.3d 401 (5th Cir. 1998).........................................................23, 32

*United States v. Niver*,
   689 F.2d 520 (5th Cir. 1982)..........................................................35, 36

*United States v. Ortiz*,
   927 F.3d 868 (5th Cir. 2019)................................................................ 32

*United States v. Parker,*
  566 F.2d 1304 (5th Cir. 1978) ................................................................. 32

*United States v. Pena-Gutierrez,*
  222 F.3d 1080 (9th Cir. 2000) ............................................................... 48

*United States v. Perez,*
  217 F.3d 323 (5th Cir. 2000) ................................................................. 49

*United States v. Phillips,*
  496 F.2d 1395 (5th Cir. 1974) .................... 19, 20, 21, 23, 24, 28, 32, 34, 35

*United States v. Pigrum,*
  922 F.2d 249 (5th Cir. 1991) ................................................................. 25

*United States v. Piper,*
  912 F.3d 847 (5th Cir. 2019) ................................................................. 47

*United States v. Rojas-Alvarez,*
  451 F.3d 320 (5th Cir. 2006) ................................................................. 29

*United States v. Sacerio,*
  952 F.2d 860 (5th Cir. 1992) ................................................................. 29

*United States v. Sandoval,*
  847 F.2d 217 (5th Cir. 1988) ................................................................. 29

*United States v. Steen,*
  55 F.3d 1002 (5th Cir. 1995) ................................................................. 32

*United States v. Tyler,*
  474 F.2d 1079 (5th Cir. 1973) ............................................................... 32

*United States v. Valenzuela-Bernal,*
  438 U.S. 858 (1982) ........................................ 6, 47, 48, 49, 51, 55

*United States v. Vargas-Ocampo*,
   747 F.3d 299 (5th Cir. 2014) (en banc) ..........................................53, 54, 56

*United States v. Villanueva*,
   408 F.3d 193 (5th Cir. 2005) ................................................................... 47

*Washington v. Texas*,
   388 U.S. 14 (1967) ................................................................................... 47

**Statutes**

18 U.S.C. § 3231 ...................................................................................... 1

18 U.S.C. § 3742 ...................................................................................... 1

21 U.S.C. § 802(8) ................................................................................... 27

21 U.S.C. § 802(11) ................................................................................. 27

**Rules**

Federal Rule of Appellate Procedure 4 ...................................................... 1

Federal Rule of Criminal Procedure 29 ..........................................43, 44, 45

Federal Rule of Criminal Procedure 51 .................................................... 44

Federal Rule of Criminal Procedure 52 .................................................... 43

## SUBJECT MATTER AND APPELLATE JURISDICTION

1.     **Subject Matter Jurisdiction in the District Court.** This case involves the prosecution of an alleged offense against United States law. The district court had jurisdiction of this case under 18 U.S.C. § 3231.

2.     **Jurisdiction in the Court of Appeals.** This is a direct appeal from a final decision of the U.S. District Court for the Western District of Texas, entering judgment of conviction and imposing sentence. This Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291. In this case, sentence was pronounced on June 29, 2021, notice of appeal was filed on June 30, 2021, and written judgment was entered on July 15, 2021.

## ISSUES PRESENTED

1. Whether the conviction should be reversed because the government failed to prove that Moncada possessed marijuana with the intent to distribute it.

2. Whether the indictment should be dismissed because the government deported a witness with material testimony favorable to Moncada in violation of his rights to due process of law and to compulsory process to obtain witnesses for his defense.

## STATEMENT OF THE CASE

Martin Moncada, Victor Campos, Karina Castro Hernandez, and Castro's six-year-old daughter were passengers in a silver car stopped by Texas Department of Public Safety troopers on December 24, 2020, near Van Horn, Texas. ROA.1078, 1319-21. When the troopers approached the car, they saw burlap-and-cellophane-wrapped bundles in it and smelled marijuana. ROA,1319-26, 1494-96, 1659, 1667-68, 1683-85.[1] The lead trooper ordered the young man driving the car, to exit. The man was handcuffed and seated on the grass on the roadside.[2] ROA.1321-23. The passengers sat in the car for about an hour before they were arrested by Border Patrol agents who had arrived. ROA.1319-26, 1343, 1371-80.

Moncada and Campos both told DEA agent Valerie Kettani they had entered the U.S. with Castro and her daughter. ROA.1078-79. None of them had permission to enter. ROA.1078-79. Moncada, a young man, and Campos, a middle-aged man,

---

1 The five bundles in the car were later found to contain 283 pounds of marijuana. ROA.1494-96.

2 The driver was 17 the day he drove this load of marijuana. ROA.1316, ROA.1511-13. He was not prosecuted. *See* 18 U.S.C. § 5032 (additional steps required to prosecute minor). By the time of the pretrial hearing three months later, the driver was 18. ROA.1295. At trial, the driver's name came out, Jose Ramos Hernandez. ROA.1511. A government exhibit showed that a Jose Ramos Hernandez had also been caught with 58 kilograms of marijuana on December 21, 2020. ROA.1682.

were unrelated but had traveled together from their mutual hometown in Mexico. ROA. 1082. Each was trying to reach Odessa, Texas, where he would be able to make arrangements with his family to get him to his final destination in the U.S. ROA.1078-79. Both men told Kettani that the three adults and the girl had crossed as a group, on their own, without a guide. ROA.1088; ROA.1565.

Moncada and Campos each said the group had flagged down a silver car near the border city of Presidio, Texas. The driver offered the group a ride. ROA.1078-80. The driver dropped them off near Van Horn, Texas, and told them he would be back in around 30 minutes. ROA.1079-80. When the driver returned, he had bundles in the car. ROA.1079-80. Moncada, Campos, and Castro arranged the bundles so they could get back in the car. This resulted in them riding either under or on the bundles, while Castro's daughter sat on the gear-shift console. This allowed the immigrant group to maintain its ride and resume its journey into the United States. ROA.1078-81, 1547-48.

Moncada and Campos were charged with possessing more than 100 kilograms of marijuana with the intent to distribute it. ROA.918. Castro was not charged. The government removed her from the country. ROA.1293-99, 1719-20.

After the government removed Castro, the defense learned she had, in an interview with the Border Patrol, given an account of the group's trip that matched

the ones Moncada and Campos had given. Castro told the government the three adults and the child were immigrants who had crossed the border together and obtained a ride with the silver car. ROA.1293-97,  ROA.1720. The driver later dropped them off, told them to wait for about 30 minutes, and returned with the car full of bundles. The driver said the bundles contained clothing. The immigrants then resumed their trip. ROA.1293-97,  ROA.1688.

The government had not disclosed Castro's interview to the defense. During her testimony at the preliminary hearing, Agent Kettani made no mention of Castro's interview. *See* ROA.1076-89. The government, knowing that Castro validated the defendants' accounts of their innocence of drug-trafficking, removed Castro from the country, placing her beyond the reach of the defendants and the compulsory process of the U.S. courts. ROA.1293-97.

The defense learned of Castro's interview after she was removed from the country. ROA.1293-97. Even then, the evidence was not advertised by the government but simply included within discovery provided to the defense on January 25, 2021.  ROA.825.

When their attorneys discovered Castro's favorable testimony, Moncada and Campos moved to dismiss the indictment. ROA.823-32, 1293-97. They argued that, by deporting Castro before apprising the defense of her statement, the government

had violated the Fifth and Sixth Amendments. ROA.823-28; *see United States v. Valenzuela-Bernal,* 458 U.S. 858 (1982).

The motion to dismiss was joined by two other motions, when, three days before trial, the government revealed that a Border Patrol agent had questioned Moncada and Campos while they were detained in the car. ROA.979-83, 995, 1000-02. The resulting statements had appeared nowhere in law-enforcement reports or discovery. ROA.979-83, 995, 1000-02.

Moncada and Campos each moved to suppress the statements as products of an unwarned custodial interrogation. ROA.1007-09; *see Miranda v. Arizona,* 384 U.S. 436 (1966). They also moved to bar the statements from trial on due process grounds, arguing that the late disclosure of the statements deprived them of the opportunity to adequately meet the statements. ROA.979-83, 1011-12.

After jury selection, but before trial began, the district court heard testimony and argument on the motions. On the suppression issue, the government presented Border Patrol Agent Eric Ramos; the defense presented DPS Trooper Terrance Foster.

Trooper Foster and his trainee, Trooper Lujan, had stopped the silver car. From their marked patrol car, they approached the silver car uniformed and visibly armed. ROA.1279. Foster ordered the driver out of the car. Lujan handcuffed him.

6

ROA.1279. Foster directed the passengers to stay put. He testified that they were not free to leave. ROA.1282. Foster did not question the passengers. ROA.1281, 1323; Gov't Ex. 3 (Foster's body-cam video).

When Agent Ramos arrived, he was told the car had contained five people and five bundles. ROA.1255-57. Ramos walked to the front passenger side and talked with Castro. ROA.1257-58. After other officers took Castro and her child from the car, Ramos turned his attention to the back of the car. Moncada was behind the driver's seat "in a fetal position facing in" and Campos was behind the passenger seat with "[o]nly half his torso and his head" visible and "his legs on the other side" of a bundle. ROA.1258-59; *see* ROA.1661-62. Ramos said to them "The weed." ROA.1258. Campos said "Yes." Moncada nodded his head. ROA.1258.

The district court found Agent Ramos's questioning "was not formal. It was more in a rapid, almost contemporaneous manner which he came up on this vehicle and started-and sort of asking a few questions." ROA.1301. The court also found there was not a formal arrest until the men were taken to a van to be transported to the Border Patrol station. ROA.1302.

On the motion to dismiss, the defendants presented testimony from Azucena Carrasco of the Texas Department of Family and Protective Services (DFPS). ROA.1289. DFPS investigates child neglect and abuse cases and assists both federal

7

and state law enforcement agencies when an arrested person is a parent with custody of a child. ROA.1289-90. DFPS logs calls made to its assistance line. ROA.1291. Neither the Border Patrol nor the DEA called for assistance with Castro's child on December 24 or 25 of 2020. ROA.1291-92. Carrasco explained that DFPS was fully operational those days with protective protocols in place to address the Covid-19 pandemic. ROA.1292.

The defendants argued that Agent Kettani's interview of Castro disclosed in discovery showed that Castro "told a story that matched our defendants' stories in substance[.]" ROA.1294. In her interview, Castro stated that the three adults and the child had crossed the border illegally and been given a ride by the man in the silver car. ROA.1294. The man later dropped them at a park and told them he would return. ROA.1294. When he returned, he had several bundles in the car; she did not know what the bundles contained. The three adults and the child squeezed into the car and resumed their journey. ROA.1294. Not long after, police stopped the car. ROA.1294. This testimony, the defense argued, was exculpatory, necessary, and lost to them by government action. ROA.1295-98.[3]

---

[3] Defense counsel also observed that they could not call the driver of the car, because he had informed the court he would invoke his Fifth Amendment right to remain silent if called to testify. ROA.1244-47.

The government argued that Castro's testimony was not material because it would be offering the facts about the immigrants' journey in its case-in-chief. ROA.1297. The government also argued that it had not acted in bad faith in removing Castro, but in the interests of Castro's daughter. ROA.1298.

The district court noted the ongoing pandemic without addressing Carrasco's testimony, and found the government had not acted in bad faith. ROA.1302-03. The court also accepted the government's argument that Castro's testimony would not be material because it would be cumulative of the government's evidence. ROA.1303.

The prosecutor's opening trial statement went right to the answers Agent Ramos had elicited in his questioning. He told the jury that "[Y]ou'll also hear that out on the scene when asked if they knew what they were sitting on, one defendant [Campos] said yes. The other [Moncada] nodded his head in the affirmative." ROA.1314.

At trial, Agent Ramos's version of the questioning differed somewhat. Ramos began by explaining that he had responded to the stop of the silver car. ROA.1396-97. As he walked up to car, he could see a woman and a young girl in the car and could see that a handcuffed man was sitting on the roadside grass. ROA.1399.

Agent Ramos walked around the car. He saw a "face kind of pressed into the furthest rear, back window, and it kind of surprised me." ROA.1400. The other officers told him there were five people and five bundles in the car. ROA.1400. Ramos first talked to Castro and her daughter. ROA.1400-01. Next, he leaned through the open front passenger door to talk to the men in the rear of the car. The two men were "almost in a fetal position." Moncada was lying "[a]lmost on top of the whole bundle" and Campos "was like half onto the bundle and half back." ROA.1401-02, 1661-62. In Spanish, Agent Ramos asked "Do you know what you're on? Campos shrugged; Moncada said no. ROA.1401-03. Ramos then asked, "That's marijuana?" Moncada "shook his head yes." ROA.1401, ROA.1404.

Moncada was taken out of the car by Agent Arteaga. ROA.1405-06. Agent Ramos stayed with Campos and frisked him after he was taken from the car. Ramos remembered asking Campos "Why did you cross with the drugs?" Campos answered, "I didn't cross. I just helped." ROA.1407.

At the station, DEA task force Sergeant Javier Bustamante asked Moncada whether he could read, then gave Moncada a Spanish form that set out five rights under *Miranda.* ROA.1499-1505, 1677-79. Moncada initialed each of the five lines of the rights advisement, and signed the form's waiver provision. ROA.1677.

Agent Kettani then questioned Moncada, with Sergeant Bustamante listening in as he did paperwork. ROA.1503. Bustamante remembered that Moncada saying "that, when the vehicle came back to pick them up when the bundles were inside the vehicle, that he was helped just to move them around so that they could fit all inside the vehicle together." ROA.1503-04. Invited to speculate by the prosecutor's claim that "Okay. So he helped–" Bustamante answered, "Unload and load, *I guess*." ROA.1503. On cross-examination, Bustamante acknowledged Moncada actually stated "he helped rearrange that so that everybody could fit inside the vehicle, because it's a small vehicle." ROA.1507-08.

Trying to explain why Castro was not a suspect though she had been riding with a bundle of marijuana in her lap, *see* ROA.1685, Sergeant Bustamante ventured that Castro did not seem strong enough to have carried a bundle from Mexico. ROA.1514. He admitted, however, that the agents did not think anyone in the car were backpackers who had carried bundles: "It was just a vehicle load." ROA.1515-16. On cross-examination, Bustamante stated that Castro had told the same story as Moncada: the party had crossed into the U.S. and flagged down a ride. The driver who picked them up, later dropped them off, and then returned with bundles in his car and told them to get back in. ROA.1528-29.

Of Campos, Sergeant Bustamante recalled that towards the end of the interview, "Ms. Kettani was telling him if he understood why he was being arrested, what charges was being pressed against him and if he understood why that–and I remember him tilting his head and using the words (speaking Spanish), which is basically in slang is: That's just the way things are and I was in possession of the marijuana." ROA.1504.

Agent Kettani testified about the interviews she conducted. She acknowledged that she wanted to keep Castro and her young daughter together. ROA.1542-43. She also acknowledged that Castro had corroborated Moncada's defense. Castro described meeting Moncada and Campos while traveling to the United States. They walked together and crossed from Ojinaga, Mexico, to Presidio, Texas, one evening. They spent the night after the crossing under a bridge. ROA.1542-43. In the morning she heard a phone ring. Later, the group flagged down a car. ROA.1543. No bundles were in the car. The car drove to Van Horn, where the driver left them in a roadside park, saying he would be back. When he returned, the car was loaded with bundle. The group squeezed back into the car. ROA.1543-44.

Agent Kettani testified that Moncada told her that "in order for them to fit into the vehicle, it was a compact car, there were five large bundles. To fit in the car, they had to remove the bundles and fix them so that they were able to fit in there."

12

ROA.1547. She acknowledged both Moncada and Castro stated that they had flagged down a ride from a passing car and that no evidence suggested they knew the driver of the car. ROA.1547-48.

A cell phone was seized from the driver of the silver car. On it, Agent Ramos found what he believed to be directions to a drop-off point. ROA.1414-15. Campos was carrying two cell phones when arrested. ROA.1406-07. Agent Kettani looked at Campos's phones, but none of the text messages she could see struck her as significant. ROA.1548-49, 1556. No other phone evidence was introduced. Campos had consented to a forensic search of his phones, but no search was done. ROA.1526.

Agent Kettani learned that the silver car was registered to a woman in Presidio who claimed she had sold it. The government adduced no evidence that either Campos or Moncada had ever owned, controlled, or even driven the car. ROA.1564.

The jury found Moncada guilty. ROA.1049-50. The district court sentenced him to the statutorily mandated 60-month imprisonment term. ROA.1655.

Moncada appealed. Among other issues, he argued that the government had failed to prove that he had possessed the marijuana in the car and had failed to prove that he had intended to distribute that marijuana. The majority of the panel that considered the case agreed. It found that neither the possession nor the intent to distribute elements had been proved and reversed the conviction. 70 F.4th 261, 266-

13

27 (5th Cir. 2023). The panel concluded that Moncada did not have ownership, dominion, or control over the marijuana and the evidence showed he had merely reentered the car for his journey not with intent to distribute the marijuana to anyone. *Id.* The dissenting judge believed that precedent meant that one who traveled pressed up against, under, or on, marijuana possessed the marijuana by virtue of that physical contact. He thought Moncada's conviction should be affirmed.

# SUMMARY OF THE ARGUMENTS

## I. The Evidence Was Insufficient to Prove Moncada Possessed Marijuana With the Intent to Distribute It.

To prove a possession with intent to distribute charge, the government must show the accused exercised dominion and control over a controlled substance while intending to transfer it to another person. The evidence in this case does not show that Moncada had either possession of the marijuana found in the car or an intent to distribute that marijuana.

Moncada did not possess the marijuana in the silver car because he never exercised dominion and control over it. The government's evidence showed that the driver had cellophane-and-burlap-wrapped bundles of marijuana in the car when he returned to pick up his hitchhiking passengers. Moncada helped rearrange the bundles in the car to allow him and his companions to get back in the car. Pushing or lifting the bundles to make room for the riders was not an act of dominion and control over the marijuana. He acted only to make room so that he and his companions could ride in the car. Moncada did not own the bundles. He had no power to decide their disposition or use.

But even if the mere acts of pushing on or lifting a bundle to make room in the car for a passenger could be considered possession, no evidence showed that Moncada did those acts, or any other act, with the intent to transfer the marijuana to

another person. The government's own evidence established that Moncada and the other two immigrants were persons grateful for a ride after a long walk and were not involved with the marijuana-smuggling operation the driver was involved in.

The panel decision that the government had not proved either possession or intent to distribute was correct and it was consistent with precedent. Precedent makes clear that the key to possession is dominion and control–power–over an object, not physical contact with an object. No rigid precedential rule equates physical contact with legal possession. Precedent does require the Court to ensure that the government has proven possession within its legal meaning. The panel conducted the required review and reached the correct decision. No evidence showed that Moncada possessed marijuana with the intent to distribute it. His conviction must be reversed.

## II. Because the Government Deported a Witness Who Had Material Testimony Favorable to Moncada, the District Court Erred By Denying the Motion to Dismiss.

The due process clause guarantees an accused a fundamentally fair trial. The compulsory process clause guarantees an accused the right to obtain the witnesses he needs to defend against criminal charges. The government deprived Moncada of these rights when it removed Karina Castro from the United States knowing that she had material information helpful to Moncada's defense.

16

Castro's testimony was material. It went directly to whether Moncada possessed marijuana with the intent to distribute it. Her testimony was favorable. It showed that Moncada had nothing to do with the marijuana but the happenstance fact that the smuggling driver had stopped for the travelers before he had picked up his load. The materiality and favorableness of the evidence Castro possessed was obvious. The government could not have made a good-faith determination that Castro did not have evidence material and favorable to the defense. By placing Castro beyond the reach of the compulsory-process power, the government violated the Fifth and Sixth Amendments and prejudiced Moncada.

## ARGUMENTS AND AUTHORITIES

### I. The Evidence Was Insufficient to Support the Conviction.

The evidence at trial did not prove that Moncada possessed marijuana with intent to distribute it. The evidence showed only Moncada's presence around a person who possessed the marijuana and who had offered Moncada, a weary immigrant, a ride. The panel correctly concluded that, under the Court's precedent concerning the legal definitions of possession and intent to distribute, the government had failed to prove the elements of the charge against Moncada beyond a reasonable doubt. The contention of the dissent that mere touching or physical proximity is possession negates the well-established requirement of dominion and control. The panel was right, and fully in accord with precedent. Moncada's conviction should be reversed.

### A.    Standard of Review

Moncada moved for a judgment of acquittal at the end of the government's case-in-chief, ROA.1568-69, but he did not renew that motion after he presented defensive evidence. In such circumstances, this Court applies plain-error standard, reviewing the evidence, in the light most favorable to the government, to determine whether the record is devoid of evidence of guilt or whether a manifest miscarriage of justice has occurred. *United States v. Delgado,* 672 F.3d 320, 330-31 (5th Cir.

18

2012) (en banc). A conviction cannot, however, be affirmed if the evidence failed to prove each element of the offense beyond a reasonable doubt, and that constitutional command applies whatever standard-of-review nomenclature is used. *Jackson v. Virginia,* 443 U.S. 307, 315-19 (1979); *see infra,* subsection ID.

### B. The evidence failed to prove Moncada possessed marijuana, let alone possessed marijuana with the intent to distribute it.

Possession is not a simple, straightforward, snapshot matter. The Court has long recognized that possession is an "ambiguous" word, *United States v. Phillips,* 496 F.2d 1395, 1397 (5th Cir. 1974), including, recently, citing a legal lexicographer who has called possession a "chameleon-hued word[,]" *United States v. Cabello,* 33 F.4th 281, 288 (5th Cir. 2022) (citing *Possession*, Bryan A. Garner, Garner's Dictionary of Legal Usage 688 (3d ed. 2011)). Through caselaw, the Court has worked out some parameters that help it to decide whether particular conduct constitutes possession. Some clear guideposts have emerged: mere proximity to an object is not possession and control over the object is essential.

These concepts guided the panel. In reviewing the evidence, the panel followed the Court's well-established caution that "the word 'possession,' especially when it occurs in criminal statutory provisions," "'is so fraught with danger that the courts must scrutinize its use with all diligence.'" *Phillips,* 496 F.2d at 1397 (quoting *Guevara v. United States,* 242 F.2d 745, 747 (5th Cir. 1957)). To do less is to ignore

that "the line between knowing possession and guilt by association can be very thin." *Phillips*, 496 F.2d at 1397. The panel proceeded carefully, identifying precedent on proximity and on control, examining the evidence adduced, and concluding the evidence did not prove possession. The panel was correct.

Precedent makes clear, as the panel set out, that proximity to an object, even a contraband one, is not enough to establish possession. *See, e.g., United States v. Cordova-Larios*, 907 F.2d 40, 42 (5th Cir. 1990); *United States v. Ferg,* 504 F.2d 914, 917 (5th Cir. 1974); *United States v. Moreno-Hinojosa*, 804 F.2d 845, 847 (5th Cir. 1986). "[M]ere presence in the area where the narcotic is discovered or mere association with the person who does control the drug or the property where it is located, is insufficient to support a finding of possession." *United States v. Gordon,* 700 F.2d 215, 217 (5th Cir. 1983).

What's required to prove a person possessed an object, either actually or constructively, in a legal sense is evidence that he had dominion and control over the object or the over the vehicle or premises containing the object. The Court has repeatedly identified control as the hallmark of possession. *See, e.g., United States v. Meza,* 701 F.3d 411, 419 (5th Cir. 2012); *United States v. Moreland,* 665 F.3d 137, 150 (5th Cir. 2011); *United States v. Onick,* 889 F.2d 1425, 1429 (5th Cir. 1989). Our most prominent legal lexicographer, Professor Garner, agrees that

20

control–which he also calls power–over an object is the key to possession of it. Professor Garner identifies four definitions of possession; he calls definitions 1 and 4, the "classic senses" of possession. The four definitions are (1) "the fact of having or holding property in one's power[,]" (2) "the right under which one may exercise power over something at pleasure, to the exclusion of all other[.]" (3) "the detention or use of something with the intention to hold it as one's own[,]" and (4) "something that a person owns or controls; property.'" *Possession*, Bryan A. Garner, Garner's Dictionary of Legal Usage 688-89 (3d ed. 2011).

Because control, power over an object, is the key in all definitions, possession of a thing is not just a matter of touching, proximity, or even lying on or next to. Rather, the nature and properties of the object limn the understanding of the actions a person must take to control it. *Cf. Phillips,* 496 F.2d at 1397 (court must carefully examine whether possession has been shown). Small items such as a paper clip from elephant keeper's desk, an orange, a baggie containing cocaine on the seat of a car, or a firearm are easily converted to one's control by physical contact. *See, e.g., United States v. Lane,* 267 F.3d 715, 718 (7th Cir. 2001) ("[p]hysical control over a gun is remarkably easy to effect."), *overruled on other gnds, Rehaif v. United States,* 139 S. Ct. 2191 (2019). That's not true of large items, such as an elephant one gets to pet, several crates of oranges alongside one in the back of an SUV, or multiple

cellophane-and-burlap-wrapped bundle containing 283 pounds of marijuana belonging to the driver of the car one accepts a ride in that are piled around and against one as a passenger. *See, e.g. United States v. Kitchen,* 57 F.3d 516, 524 (7th Cir. 1995). These larger, bulkier objects are difficult to gain control of. Control of such objects requires much more than touching or physical contact. To obtain control over drugs, "a defendant needs more than just mere physical contact; he must have the perceived right among the criminals with whom he is interacting to deal, use, transport, or otherwise control what happens to the drugs." *Id*. The legal definition of possession, and as the panel noted, common sense, recognize these basic facts about the nature of possession and the object of possession. 70 F.4th at 266 (citing *Meza,* 701 F.3d at 419). Control, not proximity or contact, is the essence of possession. *Onick,* 889 F.2d at 1429.

The position urged by the panel's dissenting judge would create a bright-line physical-contact rule that would displace the Court's proximity precedent, would run contrary to the Court's dominion-and-control precedent, and would frustrate Congress's purpose in passing a criminal statute to address problems created by actual drug smugglers and dealers, not people whose fortunes, or misfortunes, bring them near to drugs they do not control. Control of a drug requires more than touching it, moving, or rearranging its containers. *Cf. Kitchen,* 57 F.3d at 524 (possession

22

requires ability to exercise ultimate control over drugs). The dissent's rule would also end the Court's longstanding practice of looking carefully at claims of illegal possession. *See, e.g., Phillips,* 496 F.2d at 1397. The panel's approach is the correct.

A conviction for possession with the intent to distribute marijuana requires proof that the defendant knowingly possessed marijuana with the intent to distribute it. *United States v. Lopez-Monzon,* 850 F.3d 202, 206 (5th Cir. 2017); *United States v. Lindell,* 881 F.2d 1313, 1322 (5th Cir. 1989). Possession can be actual or constructive. "Actual possession means the defendant knowingly has direct physical control over a thing at a given time." *Meza,* 701 F.3d at 419 (quoting *United States v. Munoz,* 150 F.3d 401, 416 (5th Cir. 1998)). "Constructive possession is defined as ownership, dominion, or control over illegal drugs or dominion over the premises where drugs are found." *Onick,* 889 F.2d at 1429; *see also United States v. Brito,* 136 F.3d 397, 411 (5th Cir. 1998) (same).

The law is clear that mere presence in a place where drugs are found is insufficient to support a finding of either actual or constructive possession. *Ferg,* 504 F.2d at 917; *Gordon,* 700 F.2d at 217; *Cordova-Larios,* 907 F.2d at 42. The Court has enforced this principle even when a passenger who has taken a ride offered to him may have known that the vehicle in which he was offered a ride contains marijuana. *United States v. Moreno-Hinojosa,* 804 F.2d 845, 847 (5th Cir. 1986).

23

*Moreno* taught that, unless the government also showed that the passenger accepted the ride to participate in the possession and distribution of the marijuana, possession has not been shown. *Id.* The reason for that limitation is obvious. Congress, in prohibiting drug distribution meant to denounce and punish drug dealers, not bystanders or people who associated with drug dealers in a way unrelated to drug dealing. *Cf. Moreno-Hinojosa,* 804 F.2d at 247; *see also Phillips,* 496 F.2d at 1397 (line between possession and guilt by association thin).

The evidence in this case showed only that Moncada was in a car that marijuana was in and that to leave the remote location the driver had stranded him in and to continue his journey Moncada had to rearrange the bundles to squeeze in amidst them. ROA.1502-08, 1543-47. Moncada was found jammed against the front seat, in a fetal position, lying partially on, partially up against, the wrapped marijuana bundles. ROA.1402. He was not in actual physical control of the bundles; he was merely touching them. He did not have the power to control them because he could neither physically carry them off, bulky as they were together, nor did he have the right to carry them off. *See Kitchen,* 57 F.3d at 524 (defendant " must have the perceived right among the criminals with whom he is interacting to deal, use, transport, or otherwise control what happens to the drugs.") That Moncada pushed or moved a bundle to allow himself and his traveling companions to get back in the

24

car for their journeys, ROA.1507-08, ROA.1547-48, did not establish his actual control over the marijuana. He was merely rearranging the bundles to squeeze in the car to get an uncomfortable, but miles, hours, and foot saving ride. People do not "control" or even hold objects by tucking themselves awkwardly amidst them. The government's evidence showed only proximity, not actual control. Moncada moved the marijuana the driver possessed around to squeeze in the car did not make him the possessor of the marijuana. He remained a mere passenger in the presence of another's marijuana.

Nor did the government's evidence show constructive possession. "[C]onstructive possession is "`the ability to reduce an object to actual possession.'" *United States v. Pigrum,* 922 F.2d 249, 255 (5th Cir. 1991); *United States v. Cabellero,* 712 F.2d 126, 129 (5th Cir. 1983); *United States v. Martinez,* 588 F.2d 495, 498 (5th Cir. 1979).[4] When the government seeks to prove constructive possession of contraband found in a jointly occupied location, "it must present additional evidence of the defendant's knowing dominion or control of the contraband, beyond the mere joint occupancy of the premises, to prove the defendant's constructive possession." *Moreland,* 665 F.3d at 150. In *Martinez,* the

---

[4] Westlaw reports that *Martinez* was abrogated on another point of law, one relating to an interview in a secondary-inspection area at a border checkpoint.

defendant had a key to trunk of the car the marijuana was in and he had the keys to two chests in the trunk that contained marijuana. 588 F.2d at 498-99. This evidence showed that Martinez had the right to exercise dominion and control over the marijuana. *Id.* That was constructive possession.

Here, the driver had control of both the car and the marijuana it contained. No evidence at trial suggested that Moncada could direct the driver or any other person. No evidence showed Moncada had driven the car, or even that he could drive. No evidence at trial suggested the marijuana was Moncada's to control or use as he desired–in short, he could not reduce it to his possession. *Martinez,* 588 F.2d at 498. Indeed, the facts in this case highlight Moncada's lack of control–the driver's marijuana took precedence over the migrants. To get the ride they wanted, they had to accommodate the driver and the marijuana, contorting themselves to fit in the car and riding in absurd, uncomfortable positions. As Agent Ramos put it, the men looked as if they had been "shoved into the back of the hatchback[.]" ROA.1402. That's not how people, even smugglers, ride in cars. It is how migrants desperate for help on their journey often travel. *See, e.g., United States v. Garza,* 587 F.3d 304, 309 (5th Cir. 2009). The driver's marijuana was an affliction that had to be endured for Moncada to obtain a ride to Odessa, not a possession of Moncada's.

Because Moncada never had possession of the marijuana, he could not have possessed it with the intent to distribute it. But even if the Court were to conclude Moncada possessed the marijuana, his conviction must be reversed because the evidence does not show Moncada had any intent to distribute the marijuana.

Distribute means to "deliver" a controlled substance. 21 U.S.C. § 802(11). Deliver means "the actual, constructive, or attempted transfer of a controlled substance[.]" 21 U.S.C. § 802(8). Nothing in the record allows an inference that Moncada intended to transfer the marijuana. The evidence shows only that he meant to rearrange it in the car to allow the migrants to be transported. ROA.1502-07, 1547-48. That the marijuana might move with him does not show he had an intent to transfer the marijuana to another person. The record is completely devoid of evidence that Moncada intended to distribute more marijuana.

The government conceded in its briefing that "[t]here is no evidence Moncada and Campos began their venture into the U.S. with the purpose of possessing with intent to distribute marijuana." Gov't Response Br. 27. In the district court, the government had argued that the weight of the marijuana allowed an inference that they had developed such an intent when they got back in the car. ROA.1626. The panel rightly rejected that argument. 70 F.4th at 268-69; *Moreno-Hinojosa,* 804 F.2d at 247. The panel recognized that a large quantity of drugs cannot automatically be

27

proof of intent to distribute, and the absence of any evidence apart from the weight of the drugs may make that inference inapplicable. *See also Moreno-Hinojosa,* 804 F.3d at 247.

The inference of intent cannot be automatic: if it is the Court has set up an irrebuttable presumption and relieved the government of its burden of proof. Nothing in the statute creates such a presumption and the Court should take this opportunity to make clear that, while a jury might make that inference if there is other evidence of intent to distribute, weight is not conclusively evidence of intent. *Cf. Crain,* 33 F.3d at 487 (countervailing evidence was strong). This would place the intent inference on the same plane as the allowable knowledge and possession inferences, and indeed precedent supports that. A jury can infer knowledge of drugs in a place from the quantity of drugs "as long as other evidence supports the inference," *United States v. Garcia-Flores,* 246 F.3d 451, 455 (5th Cir. 2001). Presence around drugs, if there is other evidence of the indicators of possession, may show dominion and control. *Phillips,* 496 F.2d at 1397-98. The same requirement exists for intent. The quantity of the drugs may show intent to distribute if there is other evidence of such intent. *United States v. Gardea-Carrasco,* 830 F.2d 41, 45 (5th Cir. 1987) (that defendant wanted suitcase taken to particular place supported allowed inference

from weight of suitcases); *cf. Gordon,* 700 F.2d at 217 (no evidence passenger shared drug-smuggling driver's intent).

Here, no such evidence exists. Here, the evidence is plentiful that Moncada's purpose in riding in the car amidst the bundles was to get a ride to continue his journey into the United States. Nothing suggests he had any interest or intent in the marijuana's destination or owner. The record evidence did not allow any reasonable juror to find that Moncada knowingly possessed marijuana intending to distribute it. The panel was correct that the Court "h[as] not hesitated to reverse a conviction when the evidence has shown only that the defendant ran with bad company." 70 F.4th at 266 (citing *United States v. Sandoval,* 847 F.2d at 185 and. *Gardea-Carrasco,* 830 F.2d at 45. Here, Moncada did not even run with bad company; he merely accepted an ill-fated ride as part of his migrant's journey. That fate did not make him guilty of being a drug dealer.

The verdict in this case did not rest on evidence, but on speculation that Moncada could be guilty because he was riding in a car containing wrapped bundles of marijuana. That is not proof beyond a reasonable doubt. *United States v. Rojas-Alvarez,* 451 F.3d 320, 334 (5th Cir. 2006) (conviction cannot rest on speculation); *United States v. Sacerio*, 952 F.2d 860, 863 (5th Cir. 1992) (evidence must do more than suggest accused could be guilty). The conviction must be reversed.

**C. The panel followed precedent, as the cases in the dissent show.**

The dissenting opinion felt that the panel opinion broke with precedent. It did not. The panel majority adhered to precedent, following the rules for the legal definition of possession, intent to distribute, and review of the sufficiency of the evidence on appeal.

The dissenting opinion saw possession precedent as a monolith directing affirmance, not as requiring a nuanced, commonsensical review of the particular facts of each case. As shown in the panel opinion and section IB, the possession precedent led to the conclusion that, in this case with its unusual facts, the government failed in its burden of proving Moncada had possessed marijuana with the intent to distribute it.

The dissenting judge first asserted that the majority had run afoul of precedent defining physical control. 70 F.4th at 270-71. This is not so. The panel opinion carefully applied the precedent concerning possession, precedent that called for it to be circumspect and thorough and that set out clear definitions of actual and constructive possession. In complaining that the panel majority's approach broke with precedent, the dissenting judge asserted the panel majority had overlooked that Moncada had physical control and was "*actually holding* the contraband." Neither of these interrelated assertions is accurate and neither shows legal possession.

30

Physical control was not shown by the evidence. Neither was it shown that Moncada was holding the contraband. The photographic exhibit that the dissent relied on shows a man in control of nothing, including himself. The photograph shows Campos sprawled in a preposterous position across the driver's marijuana bundles. ROA.1661-62; 70 F.4th at 270. Simultaneously, Moncada was, the testimony told us, in a similarly absurd position ROA.1258-59; *see* ROA.1661-62. No reasonable understanding of physical control or holding was shown by the evidence.

The evidence showed two men contorted, seeking to make room for themselves among the driver's cargo so that they could get a ride and not have to continue their migrant's journey afoot. People generally do not hold or control objects by adopting absurd positions that subject them to the objects, and Moncada was no exception to that rule. He squeezed into the smuggler's car in a bizarre position, not to hold or control marijuana, but to take advantage of the ride the driver had offered him. ROA.1542-48. The photograph of Campos shows mere physical contact (exceedingly awkward contact at that). Neither the photograph of Campos nor the description of Moncada in a fetal position behind the front seat and on and up against the bundles, showed a man in control of anything.

The photograph shows proximity to and contact with marijuana, but contact is not control. As discussed above, there is no monolithic definition of possession as touching or holding that dictates a result that must be reached. The Court must, as the panel majority did, carefully examine the facts and evidence in each case, mindful of common sense. *See Phillips,* 496 F.2d at 1397. The cases cited by the dissenting opinion are less apposite factually and commonsensically than those on which the majority based its decision.

Five of the dissent's case involved firearm or ammunition possession, *United States v. Ortiz,* 927 F.3d 868 (5th Cir. 2019); *United States v. Hagman,* 740 F.3d 1044 (5th Cir. 2013); *United States v. De Leon,* 170 F.3d 494 (5th Cir. 1999); *Munoz,* 150 F.3d 401 (5th Cir. 1998); *United States v. Parker,* 566 F.2d 1304 (5th Cir. 1978), one involved possession of a stolen check, *United States v. Tyler,* 474 F.2d 1079 (5th Cir. 1973), and two involved amounts of drugs that could be easily carried by one person, *United States v. Steen,* 55 F.3d 1002 (5th Cir. 1995); *United States v. Ivy,* 973 F.2d 1173, 1188 (5th Cir. 1992). In short, none of these cases is factually like Moncada's case. In all of them, the nature of the property was such that physical control could be exercised over it immediately and by a single person. The cases show what common sense–and precedent–tell us, physical control over smaller objects that a defendant has physical contact with is a straightforward matter.

32

Physical control over larger objects presents a more complicated question, one that must be resolved on the facts of each case. The majority undertook the proper analysis to resolve that question. It determined that Moncada, who squeezed himself among several large bundles to get a ride, did not have physical control over those bundles. He was not holding the bundles in his grasp, they were pinning him. https://www.merriam-webster.com/dictionary/hold. In ordinary use, people do not use the word holding for something that is far too big to grasp and that is squeezing them out of a space or forcing them to ride in a car in a way no normal person would. Contrary to the dissenting opinion's claim, the majority did not "push aside" or "break with" the controlling definition of and precedent on actual possession. They applied the teachings about control and correctly decided that the evidence did not show Moncada had actual physical control of the bundles.

The dissent claims a second break with precedent because "passengers can be just as guilty of possession of contraband in a vehicle as owners." 70 F.4th at 272. It's true that passengers can be, if the government proves they constructively possessed the contraband. The majority knew this. It's why they looked to see if the evidence proved constructive possession. 70 F.4th at 267-68. The majority correctly concluded the evidence did not prove the passengers in this case controlled the

33

marijuana belonging to the driver. That conclusion was fully consistent with the precedent on constructive possession.

None of the cases that the dissent cited were more apposite than the cases the panel majority cited. *See* 70 F.4th at 267-68 (majority opinion) (citing *United States v. Brito,* 136 F.3d 397 (5th Cir. 1998), *United States v. Rogers,* 719 F.2d 767 (5th Cir. 1983), and *United States v. Cardenas,* 748 F.2d 1015 (5th Cir. 1984)). And none of the cases the dissent cited calls for a different result than the panel reached. Indeed, the cases cited by the dissent fully support the majority's conclusion that Moncada did not have constructive possession of the marijuana. In *United States v. Crain,* for example, the Court concluded that the evidence did not show constructive possession by the car's driver of the bag of drugs discovered under his seat. The Court wrote that precedent made it "especially reluctant to infer constructive possession of contraband by one occupant where there is evidence in the record explicitly linking the contraband to another occupant." 33 F.3d at 486. As in *Crain,* so in Moncada: the evidence showed the marijuana bundles belonged to the driver. The government did not offer evidence that disputed that the migrants were dropped off from a car with no bundles and that the driver returned with a loaded car.

Two cases cited by the dissent show the types of circumstances beyond mere presence in a car that show dominion or control over contraband and thus show

34

constructive possession. *Phillips,* which taught us to examine the evidence carefully because of the "very thin" line between possession and guilt by association, also observed that proof of which side of that line the defendant might be on is affected by the explanation for the defendant's presence. 496 F.2d at 1397. Here, unlike in *Phillips,* Moncada (and his walking companions) had an undisputed innocent explanation for their presence in the car. The *Phillips* defendants were stopped in South Texas. They didn't live there; they had flown there from Detroit and rented a car. Asked why they were in South Texas, the driver said the men were there for business; the passenger said family troubles had brought him there. When asked by agents for a trunk key, both men denied having one. When the agents said they were looking for aliens, the passenger asked if they were also looking for drugs. The Court concluded that "under all of these circumstances" constructive possession of the drugs in the trunk had been shown. 496 F.2d at 1398. *See also United States v. Canada,* 459 F.2d 687 (5th Cir. 1972) (evidence showed passenger's constructive possession of marijuana in trunk because he had made statements about where the drug had been crossed into the United States).

Finally, *United States v. Niver,* 689 F.2d 520 (5th Cir. 1982), also shows facts that support constructive possession and that are not present in Moncada's case. Niver was in the cockpit of a drug-laden plane from Central America that came into

the United States with no flight plan, no transponder on, no navigation lights on, and that made no response when air traffic controllers tried to make radio contact. 689 F.2d at 523-24. The pilot lied about the plane's identification number and the tail had been physically altered to try to change the number. *Id.* Niver was one of only three people on the plane; the other two were the pilot and copilot. In those circumstances, the Court found knowing constructive possession of drugs stowed on the plane had been shown.

The dissenting opinion suggests that *Niver* is apposite, apparently because a claim had been made that Niver was merely "hitching a free ride" on the plane. 70 F.4[th] at 272 (quoting 689 F.2d at 530). But that claim lacked any evidentiary support; in fact, it was never mentioned at trial and was floated only by appellate counsel at oral argument. *Niver*, 689 F.2d at 530. At Moncada's trial the evidence that he and his walking companions had hitched a ride with the silver car came in through the government's own witnesses.

The panel majority did not break with precedent. It applied precedent to the particular, unusual facts of Moncada's case and it correctly concluded that Moncada had not possessed marijuana with intent to distribute it.

**D. The Court must review the sufficiency for compliance with the reasonable-doubt standard.**

Moncada's conviction cannot stand under any standard of review. In the end, the constitution requires that the government prove each element of the offense beyond a reasonable doubt. *In re Winship,* 397 U.S. 358, 358-64 (1970); *Jackson v. Virginia,* 443 U.S. 307, 315 (1979); *see also Sullivan v. Louisiana,* 508 U.S. 275, 277-78 (1993) (fundamental structural error when instruction failed to make reasonable-doubt standard clear). A conviction cannot stand when proof is lacking. *Jackson,* 443 U.S. at 315-20. This rule applies even if the standard of review is denominated plain error and the verdict ends up being evaluated under a "manifest miscarriage of justice." Under our system, the failure to prove each element as required can lead to no result other than reversal of the unsupported conviction. *Winship,* 397 U.S. at 358-64; *Jackson,* 443 U.S. at 315-20. The panel recognized that rule and correctly reversed Moncada's conviction because it was not supported by proof beyond a reasonable doubt.

This Court has not adequately made clear that reversal of a conviction is required whenever proof beyond a reasonable doubt is absent. That a clear statement of that rule is needed is shown by several recent cases in which defense counsel failed to renew a Rule 29 motion for judgment of acquittal and a panel of the Court applied a lesser substantive standard. *See United States v. Cabello,* 33 F.4th 281, 288 (5th Cir. 2022); *United States v. Smith,* 878 F.3d 498, 503 (5th Cir. 2017). The most

forceful articulation of that lesser standard stated that, under plain-error review, the devoid-of-evidence test means "*[m]ere insufficiency doesn't cut it. Rather, the movant must prove that the evidence was so completely, obviously, and unbelievably inadequate* that allowing the verdict to stand would be a shocking and manifest miscarriage of justice.'" *United States v. Yusuf,* 57 F.4th at 445 (5th Cir.) (internal quotation omitted) (emphasis added), *cert. denied,*  143 S. Ct. 1793 (2023). *Yusuf* characterized this test as "tantamount to the eye of a virtually impassable needle." 57 F.4th at 445.

This test, which the dissenting opinion relied on in Moncada's case, cannot be squared with the Supreme Court's teachings.[5] The Court should take this opportunity to abjure it and to clarify that the sufficiency of the evidence, when challenged on appeal must always meet the constitutional standard of proof of each element beyond a reasonable doubt. "Mere insufficiency" is a constitutional violation, *Winship,* 397 U.S. at 358-64; *Jackson,* 443 U.S. at 315-20,  not a reason to look away.

―――――――――――――――

[5] The dissenting opinion asserted that the panel pushed aside precedent on sufficiency review in reversing Moncada's conviction. The panel did not. It followed precedent in examining whether the evidence proved each element of the charged offense. Reversals for insufficient evidence make up a low percentage of case dispositions, but there are plenty of them over the years. In deciding on the particular facts of the case after reviewing the evidence adduced, that the evidence was insufficient to sustain the conviction, the panel did what precedent taught it to do. See, e.g., Jackson, 443 U.S. at 315-19; *Moreno-Rodriguez,* 804 F.2d at 247.

*Jackson* stated that the question it was answering went "to the basic nature of the constitutional right recognized in the *Winship* opinion[.]" 443 U.S. at 313. *Jackson*'s ruling that the reasonable-doubt standard was required on habeas review in light of *Winship* ineluctably requires that reasonable-doubt review be used on direct review. As *Jackson* explained, the "fundamental" reasonable-doubt standard "give[s] 'concrete substance' to the presumption of innocence to ensure against unjust convictions, and to reduce the risk of factual error in a criminal proceeding[.]" *Jackson*, 443 U.S. at 315 (quoting *Winship,* 397 U.S. at 363)).

It cannot be that due process requires proof beyond a reasonable doubt at trial and requires such proof on habeas review, but skips over direct appeal. The devoid-of-evidence/mere-insufficiency standard directly contradicts Supreme Court precedent. *Jackson* specifically rejected the no-evidence standard of *Thompson v. City of Louisville,* 362 U.S. 199 (1960), as incompatible with due process. *Jackson,* 443 U.S. at 316.

The mere insufficiency articulation is untenable, and it highlights that the use of any devoid-of-evidence standard contradicts *Winship* and *Jackson.* A devoid-of-evidence test allows a conviction to stand if there is merely some evidence unfavorable to the defendant, but not evidence proving the crime. *See Yusuf,* 57 F.4th at 445 ("mere insufficiency"). A devoid-of-evidence test removes the "concrete

substance" of the reasonable-doubt standard. *Jackson,* 443 U.S. at 315. And a devoid-of-evidence test conflicts with the positions of other courts of appeals, which, while musing on the standard of review, acknowledge that the reasonable-doubt standard sets a constitutional floor.

*Jackson* held a no-evidence test was "simply inadequate to protect against misapplications of the constitutional standard of reasonable doubt[.]" 443 U.S. at 320 (rejecting *Thompson*). This is so because "a mere modicum of evidence may satisfy a 'no evidence' standard" but "it could not seriously be argued that such a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt." *Id.* The no-evidence test fails to "supply a workable or even a predictable standard for determining whether the due process command of *Winship* has been honored[.]" *Id.*

The standard articulated in *Yusuf, Cabello. Smith,* and other cases cannot be justified by a theory that de novo review falls out of the case if a Rule 29 motion is not renewed. *Delgado,* 672 F.3d at 331; *see also United States v. Inocencio,* 40 F.3d 716, 724 (5th Cir. 1994). *Delgado* reasoned that *Jackson* did not hold that a de novo standard of review was required. *Delgado,* 672 F.3d at 331. That's technically true, but it's not the relevant issue.

The issue isn't the standard of review. The issue is whether a plain-error standard can be used to look only to see if the record is devoid of evidence (or shows something more than "mere insufficiency). It cannot. A plain-error standard that uses a devoid-of-evidence test is impossible to square with *Winship* and *Jackson.* Those cases hold that proof by the government of each element beyond a reasonable doubt is necessary. That is the constitutional floor for sustaining a conviction. *Winship,* 397 U.S. at 358-64; *Jackson,* 443 U.S. at 315-19. *"Winship* presupposes as an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson,* 443 U.S. at 316.

*Jackson* made it clear that "the due process standard recognized in *Winship* constitutionally protects an accused against conviction except upon evidence that is sufficient fairly to support a conclusion that every element of the crime has been established beyond a reasonable doubt." *Id.* at 314. *Jackson* held that the reasonable-doubt sufficiency standard was required on habeas review because "a properly instructed jury may occasionally convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt, and the same may be said of a trial judge sitting as a jury." *Id.* at 317. Driving home why the constitution required

41

reasonable-doubt review, *Jackson* observed that "[i]n a federal trial, such an occurrence has traditionally been deemed to require reversal of the conviction." *Id.* (citing *Glasser v. United States,* 315 U.S. 60, 80 (1942)).

The *Winship/Jackson* reasonable-doubt standard is not a mere standard of review. Whatever standard-of-review nomenclature is used, the *Winship/Jackson* standard requires that every element of an offense be proved beyond a reasonable doubt. *Winship,* 397 U.S. at 358-64; *Jackson,* 443 U.S. at 316-19.

The devoid-of-evidence/mere insufficiency standard is not one used by other courts of appeals. While other circuits have held that a defendant's failure to renew a motion for judgment of acquittal can be said to trigger plain-error review, s*ee, e.g., United States v. Geronimo,* 330 F.3d 67, 72 (1st Cir. 2003); *United States v. Flyer,* 633 F.3d 911, 917 (9th Cir. 2011); *United States v. Bowie,* 892 F.2d 1494, 1496-97 (10th Cir. 1990), those circuits recognize that, despite their use of the plain-error terminology, the question is whether the government proved the required offense elements. *See Flyer,* 633 F.3d at 917 ("plain-error review of a sufficiency-of-the-evidence claim is only theoretically more stringent than the standard for a preserved claim."); *Bowie,* 892 F.2d at1496-97 (under plain-error review, "[w]hen considering the sufficiency of the evidence to support the verdict,. . . the standard actually applied is essentially the same as if there had been a timely motion for acquittal.");

*Geronimo,* 330 F.3d at 74 (concluding from evidence government had sufficiently proved challenged offense element).

Finally, the use of plain-error review in the sufficiency context is unsupported. Plain-error review makes sense when a defendant's counsel has given no hint in a district court proceeding as to what his argument is. Thus, the *Delgado* court rightly recognized that even constitutional issues can sometimes be reviewed for plain error. *Delgado,* 672 F.3d at 331 (citing *United States v. Knowles,* 29 F.3d 947 (5th Cir. 1994) (challenge to constitutionality of firearms law). A challenge to the constitutionality of a statute not raised in the district court comfortably fits under plain error. *Knowles,* 29 F.3d at 950. The district court had no way of knowing the defendant thought the statute was unconstitutional, and the district court was the entity that would have had to rule on the statute's constitutionality had that thought been voiced.

These things are not true in an appeal from a jury verdict of guilty. When the sufficiency of the evidence is challenged on appeal, the question is did the evidence support the jury's verdict. Unlike the constitutionality of a statute or the admissibility of evidence, both of which are issues decided by the district court, the ultimate decision-maker in a criminal jury trial is the jury. The point of a jury trial is to assert the government cannot and has not proved its case. The jury understands the

43

defendant's contention is that the evidence does not prove guilt beyond a reasonable doubt. A challenge to the evidence underlying a verdict is not a challenge unvoiced in the district court and thus is not a challenge to which Rule 52(b) applies.

Nor does the text of Rule 29 support application of plain-error review to sufficiency challenges. The Rule permits, but does not require, a defendant to make a motion. The text of Rule 29 does not require renewal of the motion once made. That defense counsel did not take an act not required of him by the text of Rule 29 thus does not justify imposing a plain-error standard of review. The focus on appeal is the defendant's due process right to not be convicted when the government has not proved every element of the charged offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 316-19. Rule 29 does not create that right. The constitution does. The failure of a defendant to renew a Rule 29 motion cannot diminish that right.

Federal Rule of Criminal Procedure 51 and the Supreme Court's interpretation of that rule also show that plain-error review of a sufficiency claim is unwarranted. As the Supreme Court has explained–since *Delgado* was decided–federal practice requires a party to make clear in the trial court what he is requesting. Fed. R. Crim. P. 51; *Holguin-Hernandez v. United States,* 140 S. Ct. 762, 766 (2020). When a defendant has made his request clear, plain-error review is not appropriate. *Holguin-*

*Hernandez,* 140 S. Ct. at 766. A criminal defendant who goes to trial is asking for an acquittal. The entire point of a trial is to determine whether the government has sufficient evidence to convict the defendant.

By seeking a judgment of acquittal at the close of the government's evidence, Moncada informed the trial court of the action he wished it to take. *Holguin-Hernandez,* 140 S. Ct. at 766. He further insisted on proof of each element beyond a reasonable doubt throughout the closing argument of the case. *Cf. id; see* ROA.1628-33. No one could mistake what Moncada sought: an acquittal. He did not somehow abandon that goal because he did not renew his Rule 29 motion after presenting evidence, but before arguing for a verdict of not guilty. The point of a trial is to put the government to its constitutional burden of proof. One who does so, has not waived his right to de novo review of the constitutional sufficiency of the evidence. But, even if plain-error review were to be applied to this case, reversal of Moncada's conviction is required because the evidence failed to prove the elements of the offense beyond a reasonable doubt.

## II. Because the Government Deported a Witness Who Had Material Testimony Favorable to Moncada, the District Court Erred By Denying the Motion to Dismiss.

Karina Castro gave a statement to the agents who arrested her that was obviously favorable to Moncada. Castro's statement showed that Moncada was a

traveler, in the wrong place at the wrong time, not a marijuana smuggler as the government alleged. The government did not mention Castro's statement at the preliminary hearing on the charge against Moncada. The government disclosed the statement only after it had removed Castro from the United States.

The removal of a witness with evidence that was material and favorable to his defense violated Moncada's rights under the Fifth and Sixth Amendments and required dismissal of the charge against him. The district court erred by denying Moncada's motion to dismiss the charge.

### A.   Standard of review.

This Court reviews de novo constitutional claims regarding due process and compulsory process rights. *United States v. Villanueva,* 408 F.3d 193, 200 (5th Cir. 2005).

### B.     The Applicable Law.

The Fifth Amendment "guarantees that a criminal defendant will be treated with 'that fundamental fairness essential to the very concept of justice.'" *United States v. Piper,* 912 F.3d 847, 854 (5th Cir. 2019) (quoting *United States v. Valenzuela-Bernal,* 458 U.S. 858, 872 (1982) and *Lisenba v. California,* 314 U.S. 219, 236 (1941)). The Sixth Amendment guarantees a defendant that he will be able to use compulsory process for "obtaining witnesses in his favor." That guarantee prevents the government from arbitrarily depriving a defendant of "testimony [that] would have been *relevant* and *material*, and . . . *vital* to the defense." *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867 (1982) (quoting *Washington v. Texas,* 388 U.S. 14, 16 (1967) (emphasis added by *Valenzuela-Bernal*). These guarantees are offended against "if, by deporting potential witnesses, [the government] diminished a defendant's opportunity to put on an effective defense." *California v. Trombetta,* 467 U.S. 479, 486 (1984) (citing *Valenzuela-Bernal,* 458 U.S. at 873).

47

*Valenzuela-Bernal* explained that not all deportations of witnesses violate the constitutional rights of an accused. The government remains both free and duty-bound in the exercise of its power over immigration to remove potential witnesses "once it [has] concluded that they possessed no evidence relevant to the prosecution or the defense of respondent's criminal charge." 458 U.S. at 866. As *Valenzuela-Bernal* explained, this means that the government has a responsibility to make a "*good-faith determination that [the witnesses] possess no evidence favorable to the defendant in a criminal prosecution.*" 458 U.S. at 872 (emphasis added).[6]

It may be that the good-faith effort required to meet *Valenzuela-Bernal* does not demand much in the way of affirmative investigation by the government, but surely the government may not claim that its obligation not to remove a material, favorable witness disappears when it does investigate, and it does discover favorable

------

[6] This Court has noted that some courts of appeals have read into *Valenzuela-Bernal* a requirement that the defendant demonstrate that the government acted in bad faith. *Gonzalez,* 436 F.3d at 578 (citing *United States v. Chaparro-Alcantara,* 226 F.3d 616 (7th Cir. 2000); *United States v. Pena-Gutierrez,* 222 F.3d 1080, 1085 (9th Cir. 2000); *United States v. Iribe-Perez,* 129 F.3d 1167, 1173 (10th Cir. 1997)). This Court has never adopted such a requirement. That position is correct. *Valenzuela-Bernal*'s plain language imposes a duty on the government of good-faith inquiry. 458 U.S. at 872. The government must make reasonable efforts and not simply turn away from obvious material and favorable statements from potentially deportable witnesses. *Id.*

evidence. A reasonable reading of the *Valenzuela-Bernal* good-faith-determination rule cannot allow the government to ignore what it has learned. *Cf.* 458 U.S. at 872 (setting out standard). The government's suggestion that it can ignore what it learned from its investigation unless the defendant can explicitly show the government acted in bad faith must be rejected as inconsistent with *Valenzuela-Bernal.*

When the government has removed a potential defense witness, the accused must show that the witness had evidence material and favorable to his defense and that the witness was not "merely cumulative to the testimony of available witnesses." 458 U.S. at 873. He must also show that the loss of the material evidence, in the context of the entire record, created "a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." 458 U.S. at 873-74 (citing *Giglio v. United States,* 405 U.S. 150, 154 (1972)); *see also United States v. Perez,* 217 F.3d 323, 326 (5th Cir. 2000). In considering whether there is a reasonable likelihood that the evidence lost by the government's actions affected the verdict, the Supreme Court reminded us that "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Valenzuela-Bernal,* 458 U.S. at 874 n.10 (quoting *United States v. Agurs,* 427 U.S. 97, 112-13 (1976)).

49

### C. Castro's testimony was material and favorable and reasonably likely to affect the jury's verdict.

Karina Castro's statements were relevant, material, and not cumulative. Had those statements been revealed to the defense and Castro not been removed from the country, she would have been available to testify at Moncada's trial. There is a reasonable likelihood that the jury would have reached a different verdict had it heard Castro's testimony from the stand.

But Moncada never had a chance to present Castro. Castro's statement, even though it was obviously exculpatory of Moncada, was kept from Moncada's counsel until after the government had deported Castro and put her beyond the reach of judicial process.

Moncada adamantly denied any involvement with marijuana. ROA.1108.[7] He told Agent Kettani that he had crossed the into the United States with Castro, her daughter, and Campos. He told Kettani that the group had tried to flag down a ride and that the silver car had stopped for them. He told Kettani that the driver of the silver car had driven them north, but then directed them to get out of the car and wait

---

[7] At a "status" conference the district court tried to impress on Moncada that he would get a lower sentence by pleading guilty than by going to trial and being found guilty. ROA.1103-08. Moncada answered: "Well, Judge, I am not guilty." ROA.1108.

when they neared Van Horn. When the driver returned, the car was filled with bundles. Moncada admitted helping to rearrange the bundles so that the travelers could squeeze back into the car to keep their ride. ROA.1507-08; ROA.1547-48.

Castro's statement to Kettani tracked and reinforced the details of Moncada's story. Its relevance was therefore obvious. So is its materiality. It would have been important for the jury to hear the story of the journey from one of the travelers, whether on the stand or in deposition testimony. The government could not have failed to recognize the relevance and materiality of Castro's statement. Those qualities were inescapably obvious. And yet, the government did not reveal Castro's statement, ROA.1295-99, and it did not ask the district court to set a deposition for her considering the exceptional circumstances involving the presence of her child and Covid-19. *Cf. United States v. Allie,* 978 F.2d 1401, 1405 (5th Cir. 1992) (explaining deposition procedure and standards).

The government did not contact Family Services for aid with Castro's child. It did not explore paroling Castro and her daughter into the county until the case was resolved. Instead, it sent her out of the country and only then provided her statement to the defense. ROA.1719-20. Such conduct did not meet the good-faith inquiry test of *Valenzuela-Bernal.* See 458 U.S. at 872 (witness can be deported only after good-faith determination that her evidence is not material and favorable to accused).

51

There is a reasonable likelihood that the outcome of the case would have been different if Castro's testimony had been presented. The government's case against Moncada was not strong. He was in a car with bundles of marijuana, but he had a coherent, consistent, and plausible account of how he came to be there. Mere presence in an area where drugs are found is, of course, insufficient to support a finding of possession. *United States v. Ferg,* 504 F.2d 914, 917 (5th Cir. 1974). The government had only Moncada's presence in the car to suggest he had control over the drugs. But the car did not belong to Moncada, and no evidence showed he had any ability to control the car or the marijuana. The government had no text messages or phone calls connecting Moncada to marijuana. It had no suspicious circumstances or nervous behavior to suggest awareness of drug trafficking. *United States v. Diaz-Carreon,* 915 F.2d 851 (5th Cir. 1990) nervousness and inconsistent story); *United States v. Cordova-Larios,* 907 F.2d 40 (5th Cir. 1990) (passenger got out and crossed on foot so as not to be in truck, told implausible story).

In this context, Castro's testimony was necessary. She could tell the jury about the immigrant journey that ended with the arrest–how the good fortune of catching a ride with the young man became a curse. She could tell the jury first-hand about the crossing, the flagging down of the car, the actions of the driver, and the driver's control of the marijuana. She could tell the jury that none of the three adult travelers

were involved with the marijuana; they sought only to journey into the United States and took the ride they could find. *See* ROA.1298-99. No other witness could do this. *Cf. United States v. Gonzalez,* 436 F.3d 560, 578 (5th Cir. 2006), (recognizing prejudice where witness testimony was non-cumulative), *overruled on other grounds, United States v. Vargas-Ocampo,* 747 F.3d 299, 301 (5th Cir. 2014) (en banc). Castro was the only disinterested witness who had been present on the trip.

Castro's testimony would not have been merely cumulative of the testimony of Agent Kettani and Sergeant Bustamante who told their versions of Castro's story at trial. Castro, unlike the agents, was present for the relevant events. She had traveled with Moncada and Campos. ROA.1293-97; ROA.1720. She could talk in detail about their trip and of their experiences. Most critically, she could have testified about what she observed when the driver returned with the marijuana. She could have described the traveler's demeanors, including how Moncada and Campos looked when they saw the driver's load. She could have described their actions and any contextual, non-hearsay discussions that were held before the men made room for the migrants to cram back in and resume their journeys.

This first-hand evidence was lost to Moncada and kept from the jury because the government removed Castro from the country. The prosecutor's suggestion before trial that it would be enough for the jury to hear through the agent Moncada's

statements about the trip, ROA.1297-98, was wrong for several reasons. First, it ignored that the agents were partisans who could spin the interpretation of the statements by the tone and content of her answer or the look on her face. The agents could only relate, from their partisan position, the answers Castro had given to questions they had asked while engaged in the "often competitive enterprise of ferreting out crime." *Johnson v. United States,* 333 U.S. 10, 14 (1948). Defense counsel, had Castro not been removed, would have presented a fuller, more detailed story through Castro, whether at trial or at a video deposition, The jury could then have evaluated Castro's details and credibility, as a jury should. *Cf. United States v. Vargas-Ocampo,* 747 F.3d 299, 301 (5th Cir. 2014) (en banc).

Second,  the agent had not been on the journey as Castro had and she could not add detail from memory of the events. Third, the jury, not the agent, was the proper entity to evaluate the full story and by keeping Castro from the stand the government got to present only the agent's version of things. Kettani's testimony did not render Castro's actual experience and testimony cumulative.

The cases that the government offered the panel as supporting its cumulative claim are inapposite. In *United States v. Romero-Cruz*, 201 F.3d 374 (5th Cir. 2000), there was only a single fact favorable to the defendant that the witnesses would have testified to, and the agents had conceded that fact on cross-examination. More

importantly, the government had significant other evidence of Romero's guilt and two witnesses who directly contradicted the fact the agents acknowledged. Here, Castro had evidence to add that was relevant to the most important issue in the case–how the defendants acted around the car when the driver returned in ways that indicated they did not have an intent to distribute the marijuana.

Similarly, *United States v. Escobar*, 462 Fed. Appx. 58, 65 (2d Cir. 2012), which the government cited to support its cumulative-testimony argument, does not help it in this case. *Escobar* presented very different facts. There, the removed witnesses had given prior written statements that "the defendants voluntarily declined to introduce[.]" *Id.* Here, the defense could not bring before the jury evidence that could come only through the removed witness.

The loss of access to Castro, the loss of the chance to investigate what she knew, the inability to present her unique knowledge as trial testimony was harmful to Moncada. There is a "a reasonable likelihood that [Castro's] testimony could have affected the judgment of the trier of fact." *Valenzuela-Bernal,* 458 U.S. at 873-74. In this case, in which the verdict "is already of questionable validity" because of the lack of evidence of possession with intent to distribute, Castro's evidence would have been of sufficient importance "to create a reasonable doubt." *Valenzuela-Bernal,* 458 U.S. at 874 n.10 (quoting *United States v. Agurs,* 427 U.S. 97, 112-13

(1976)). The district court erred by denying the motion to dismiss. The conviction should be vacated, and the case remanded with instructions that it be dismissed with prejudice.[8]

Castro's testimony would have corroborated and established for the jury that Moncada's statements about his trip, which the jury heard only through Agent Kettani, were accurate and true, or, at the least, given the jury a reasonable doubt about the government's tenuous case. Castro's presence, manner, and demeanor, whether observed live on the stand or through a videotaped deposition, would have affected the jury's decision. This Court has often explained the critical importance of "the dramatic insights gained from watching [the witnesses at] the trial." *Vargas-Ocampo,* 747 F.3d at 301. Because of the government's failure to disclose Castro's statement to the defense before it removed Castro from the country, Moncada never

---

[8]  That Castro was a critical witness, with testimony no other witness could deliver, sets this case apart from cases, including *Valenzuela-Bernal,* in which the defendant has claimed that the deportation of a witness prejudiced him, but not explained why the deported witness was needed. In *Valenzuela-Bernal,* one of the three undocumented immigrants whose transport formed the basis for the criminal charge was present in the country for trial and the court ruled that the defendant had not advanced a "plausible explanation of the assistance he would have received from the testimony of the deported witnesses." 458 U.S. at 871.

By contrast, in this case, no other witness could testify to the facts that Castro related in her interview. And no evidence beyond Moncada's mere presence as a passenger in the car with the marijuana connected him to a drug crime.

had the chance to subpoena, depose, or present Castro. He never had the chance to have the jury look upon Castro, listen to her, and consider the importance and weight to be given to her statements. He never got to exercise his right to compulsory process. He never got to present his effective defense. The conviction should be vacated. The case should be remanded to the district court with instructions to grant the motion to dismiss the indictment.

## CONCLUSION

Moncada's conviction should be reversed, and the case should be dismissed with prejudice. *Burks v. United States,* 437 U.S. 1, 18 (1978). Alternatively, the conviction should be vacated, and the district court directed to dismiss the indictment.

Respectfully submitted.

By:    */s/ Philip J. Lynch*
      Law Offices of Phil Lynch
      17503 La Cantera Parkway
      Suite 104-623
      San Antonio, Texas 78257
      Tel.: (210) 378-3114
      LawOfficesofPhilLynch@satx.rr.com

      Attorney for Defendant-Appellant Moncada

## CERTIFICATE OF SERVICE

I certify that, on October 5, 2023, I electronically filed this Brief with the Clerk of Court using the CM/ECF system, which will send notification of the filing to Assistant U.S. Attorney Joseph H. Gay Jr. via electronic mail.

By:    */s/ Philip J. Lynch*
      Attorney for Defendant-Appellant
      Moncada

## ECF CERTIFICATION

I certify that: 1) required privacy redactions have been made; 2) the electronic submission is an exact copy of the paper document; and 3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

By:    */s/ Philip J. Lynch*
      Attorney for Defendant-Appellant

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Certificate of Compliance with Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

    ● this brief contains 12,647 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), *or*

    ○ this brief uses a monospaced typeface and contains _____ lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP.P. 32(a)(6) because:

    ● this brief has been prepared in a proportionally spaced typeface using WORD in Times New Roman 14 pt., *or*

    ○ this brief has been prepared in a monospaced typeface using _____ _____.

/s/ Philip J. Lynch

Attorney for Martin Moncada de la Cruz, Appeal No. 21-50642

Dated: October 5, 2023